UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:19 CR 1040 HEA (JMB) |
| | ) | |
| DEMETRIUS INGRAM, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Currently before the Court is Defendant Demetrius Ingram's Motion to Dismiss or in the Alternative to Suppress.  [ECF No. 83]  The government opposes the motion.  Pretrial motions were referred to the undersigned United States Magistrate Judge.  See 28 U.S.C. § 636(b).

## PROCECURAL BACKGROUND

Ingram is charged by Indictment with possession of a firearm by a previously convicted felon.  The charge flows from a police encounter in the City of St. Louis on November 8, 2019.  Ingram was arrested and had his initial appearance on January 23, 2020.  On December 4, 2020, Ingram filed the instant motion.  On April 21, 2021, the Court held an evidentiary hearing on Ingram's motion.  Ingram was present with Assistant Federal Public Defender Felicia Jones, and the government was represented by Assistant U.S. Attorney Jennifer Szczucinski.  The government presented the testimony of St. Louis Metropolitan Police Department Officers Courtney Nash and Erich Vonnida.  Defense counsel extensively cross-examined both witnesses.

Following the evidentiary hearing, the parties were directed to file post-hearing memoranda.  On June 7, 2021, defense counsel filed Ingram's memorandum.  [ECF No. 96]  The

government filed its post-hearing memorandum on June 23, 2021.  [ECF No. 99]

Based on the testimony and evidence from the evidentiary hearing, having had the opportunity to observe the demeanor and evaluate the credibility of the witnesses, and having fully considered the parties' arguments and written submissions, the undersigned makes the following findings of fact, conclusions of law, and recommendations.

## FINDINGS OF FACT

Courtney Nash and Erich Vonnida are officers with the St. Louis Metropolitan Police Department ("SLMPD").  As of the evidentiary hearing, Officer Nash had about eight years of experience and Officer Vonnida had about 13 years of experience.  Both officers are assigned to the Mobile Reserve Unit ("Mobile Reserve")[1] and both were so assigned in November 2019. According to Officer Nash, Mobile Reserve operates as "a crime suppression unit" that "respond[s] to different neighborhoods in the city."  (Tr. at 6)  Mobile Reserve officers typically do not respond to regular calls but engage in "self-initiated activity," looking for criminal activity.  (Tr. at 7)

During the early afternoon of November 8, 2019, Officer Nash was on duty with Officer Zachary Opel.  Both officers were operating in uniform, in a marked police vehicle, in the Jeff-Vander-Lou neighborhood of St. Louis.  Officer Opel was driving.

Officer Nash testified that the Jeff-Vander-Lou neighborhood is a high-crime area. During their patrol, Officer Nash noticed two men standing at the southeast corner of North Grand and St. Louis Avenues.  One of the men, later identified as Ingram, had a cross-body satchel.  Officer Nash testified that, based on his experience, cross-body satchels are often used to conceal firearms and narcotics.  Office Nash also testified that he had observed Ingram at that

---

[1] At the time of the evidentiary hearing, Officer Vonnida was on medical leave.

location earlier.  With this information, Officer Nash decided to approach Ingram and talk with him.  Office Nash acknowledged that he had not observed Ingram commit any crime, but he was nonetheless suspicious of Ingram.  Officer Nash testified that he was not going to arrest Ingram and Ingram could have walked away.

Officers Nash and Opel were in radio communications with other officers in the area, including Officer Vonnida.  At the time Officer Nash attempted to engage with Ingram, he notified other officers that he was going to attempt to talk with Ingram.  Office Vonnida, who was also in uniform in a marked police vehicle, was positioned about 150-200 feet south of Officers Nash and Opel.

Officer Opel drove the marked police vehicle to the corner where Ingram was standing and stopped.  As Officer Nash opened his door to exit the vehicle, Ingram ran away to the south. Officer Nash credibly testified that he did not say anything to Ingram at this point—he did not tell him to stop or even that he wanted to speak with Ingram.  As a result, Officer Nash got back into the police car and he or Officer Opel radioed other officers in the area that Ingram had fled.

Anticipating Ingram's likely route of travel, Officers Nash and Opel drove to Bacon Street, which was nearby.  Officers Nash and Opel encountered and seized Ingram shortly after Ingram scaled a six-foot fence and ran through an alley.  Officer Opel placed Ingram in handcuffs.

While Officers Nash and Opel were heading toward Bacon Street, Officer Vonnida chased Ingram.  In particular, Officer Vonnida testified that he observed the two men loitering at the corner, and that one man was wearing all dark clothing and the other man (Ingram) was wearing a light-colored jacket, with light-colored pants and "a man bag around his body." (Tr. at 34)  Officer Vonnida, like Officer Nash, testified that the man bag gave him some concerns

3

because it was a high-crime area, and such bags are frequently used to "carry narcotics, guns, weapons, and cash used in drug sales and other violent crimes." (Tr. at 36)  Officer Vonnida observed Ingram flee as Officer Nash attempted a "voluntary field interview." (Tr. 36)  Officer Vonnida testified that Ingram first ran south, "and then cut eastbound through a rear parking lot of a small strip mall…." (Tr. at 37)  Officer Vonnida exited his police vehicle and chased after Ingram.  As Ingram neared the end of the parking lot, Officer Vonnida observed Ingram remove a gun from the bag and throw it into a trash can.  Officer Vonnida testified that he announced over the radio that Ingram threw a pistol and was running toward the other officers.  According to Officer Vonnida, Ingram continued running, scaled a fence, and continued about another half block before he was apprehended by Officers Opel and Nash.

Officer Vonnida came up behind Ingram as he was being apprehended, and Officer Vonnida informed the other officers that he observed Ingram discard a firearm into a trash can. Officer Vonnida returned to the trash can, which was open, and retrieved a purple Taurus pistol, which he relinquished to Officer Nash.

After detaining Ingram, Officer Nash conducted a computer inquiry and learned that Ingram was a convicted felon; another computer check indicated that the Taurus pistol was reported stolen.

Officer Nash testified that he advised Ingram of his Miranda rights, but he could not recall if he read them from a card or from memory.[2]  Officer Nash testified that Ingram acknowledged that he understood his rights.  Ingram was arrested and placed in a police vehicle for transport to the St. Louis Justice Center.  During transport, he asked Officer Nash if the

---

[2] Officer Vonnida testified that he overheard Officer Nash providing Miranda warnings to Ingram.

Taurus was stolen.  Officer Nash explained that the this was significant because the officers had not shown the pistol to Ingram.

Additional findings of fact are included in the discussion below.

## DISCUSSION, CONCLUSIONS OF LAW, AND RECOMMENDATION

### I.    Summary of Issues Raised

In his motion as filed, and in his post-hearing memorandum, Ingram argues that the Indictment must be dismissed because the police lacked reasonable suspicion to stop, detain, and/or frisk him.  In the alternative, Ingram asks the Court to suppress any statements he made as the fruit of his illegal detention.

The government counters that there was no unconstitutional stop.  The government contends that no seizure occurred when Officer Nash attempted to speak with Ingram.  The government contends that the police had reasonable suspicion to detain Ingram after they observed him flee and discard a firearm.  The government contends that Ingram was lawfully arrested after the officers determined he was a convicted felon.  As for Ingram's requested relief, the government argues that dismissal of the Indictment is not an authorized remedy for an alleged Fourth Amendment violation.

### II.    Analysis of Issues Raised

#### A.    The Initial Encounter Between the Police and Ingram

The fundamental question posed by Ingram's motion is whether the initial encounter between Officer Nash and Ingram was constitutional.

The Fourth Amendment prohibits unreasonable seizures of the person.  See United States v. Lozano, 916 F.3d 726, 729 (8th Cir. 2019).  Not every encounter between a police officer and a private citizen amounts to a seizure.  "An officer may generally approach an individual and ask

him questions, even when the officer does not have a basis for suspecting that the individual has committed or is committing a crime, so long as the officer does not convey a message that compliance with his request is required."  United States v. Turner, 934 F.3d 794, 797 (8th Cir. 2019) (citations omitted, cleaned up), cert. denied, 140 S. Ct. 1217 (2020); see also United States v. Drayton, 536 U.S. 194, 201 (2002) ("Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search … provided they do not induce cooperation by coercive means.").  In Fourth Amendment terms, these interactions are often referred to as consensual encounters.  See Florida v. Bostick, 501 U.S. 429, 434 (1991); see also United States v. DaCruz-Mendes, 970 F.3d 904 (8th Cir. 2020).  The Eighth Circuit has identified several, non-exclusive factors for determining when a consensual encounter ripens into a seizure.  These factors include:  "officers positioning themselves in a way to limit the person's freedom of movement, the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating compliance is necessary, the officer's retention of the person's property, or an officer's indication the person is the focus of a particular investigation."  United States v. Garcia, 888 F.3d 1004, 1009 (8th Cir. 2018) (quoting United States v. Aquino, 674 F.3d 918, 923 (8th Cir. 2012)).  "The burden of proving that an encounter was consensual rests with the government."  Lozano, 916 F.3d at 729 (citations omitted).

All of the available facts and circumstances direct a conclusion that Ingram was not seized when Officer Nash exited his police vehicle and attempted to speak with him.  Officer Nash credibly testified that he did not speak or utter any commands at Ingram.  Rather, he simply started to exit his vehicle and Ingram turned and ran south down the street.  This was an unsuccessful attempted consensual encounter.  There was no seizure at that time.

Furthermore, it does not matter that Officer Nash may have been acting solely on a hunch, or even that he may have expected to uncover criminal conduct or develop reasonable suspicion by speaking with Ingram. Officer Nash did not manifest any conduct indicating that "compliance with [a] request [to speak with him was] required." Turner, 934 F.3d at 797. None of the factors identified in Garcia suggest that any seizure occurred when Officer Nash attempted approach and speak with Ingram. Officer Nash's routine act of exiting a vehicle, with nothing more, cannot reasonably be viewed as the functional equivalent of seizing Ingram or conveying a message that Ingram was required to speak with him.

The undersigned finds that the initial interaction between the police and Ingram was an unsuccessful attempt at a consensual encounter which was not unconstitutional.

**B.      The Pursuit and Seizure of Ingram**

There is no dispute that Ingram was eventually seized and detained following a brief pursuit. Thus, the Court must determine whether the police had reasonable suspicion at the moment they seized Ingram. As explained below, the undersigned finds that Ingram was not seized for Fourth Amendment purposes until Officers Opel and Nash restrained him following the foot chase, and at that moment, the police had developed reasonable suspicion.

**1.      The Pursuit**

"[I]t is well established that 'police pursuit in attempting to seize a person does not amount to a 'seizure' within the meaning of the Fourth Amendment.'" United States v. Houston, 920 F.3d 1168, 1172 (8th Cir. 2019) (quoting United States v. Taylor, 462 F.3d 1023, 1026 (8th Cir. 2006) and citing California v. Hodari D., 499 U.S. 621, 626 (1991)). A suspect's failure to submit to a directive to "stop" means that no seizure has occurred. See United States v. Flores-Lagonas, 993 F.3d 550, 559-60 (8th Cir. 2021). In this regard, however, the Supreme Court

recently clarified that an unsuccessful attempt to restrain a person can amount to a Fourth

Amendment seizure when police officers apply physical force to the body of a person with the

intent to restrain that person, even if the attempt is unsuccessful and the person escapes.  See

Torres v. Madrid, 141 S. Ct. 989, 995-98 (2021).  Whether a person is seized is an objective

inquiry, it does not "depend on the subjective perceptions of the seized person" or the subjective

motivations of the police.  Id. at 998-99.

       In this case, no physical force was applied to Ingram before he ran away.  Other than

exiting a police vehicle, there was no physical or verbal no show of authority whatsoever.  Even

after Torres v. Madrid, the rule of Hodari D. applies.  See Flores-Lagonas, 993 F.3d at 559-60.

There was no restraint or seizure of Ingram merely because the police elected to pursue him after

he fled on foot from the attempted consensual encounter.  Simply stated, the fact that the police

pursued Ingram, on these facts, does not amount to a seizure.

## 2.    The Seizure

       Police officers may briefly detain an individual for an investigative purpose when they

have a reasonable suspicion that "criminal activity may be afoot."  Terry v. Ohio, 392 U.S. 1, 30

(1968).  See also United States v. Roberts, 787 F.3d 1204, 1209 (8th Cir. 2015).  "The concept of

reasonable suspicion is not 'readily, or even usefully, reduced to a neat set of legal rules.'"

United States v. Quinn, 812 F.3d 694, 697 (8th Cir. 2016) (quoting Illinois v. Gates, 462 U.S.

213, 232 (1983)).  "Reasonable suspicion must be supported by more than a 'mere hunch,' but

'the likelihood of criminal activity need not rise to the level required for probable cause, and it

falls considerably short of satisfying the preponderance of the evidence standard.'"  Roberts, 787

F.3d at 1209 (quoting United States v. Arvizu, 534 U.S. 266, 274 (2002)).  A reviewing court

considers the totality of the circumstances.  See id.  In assessing the reasonableness of the

suspicion, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." Arvizu, 534 U.S. at 273 (internal quotations and citation omitted).  The Court may also consider "[s]ituational factors including the time of day or night and the location of the suspect parties." Roberts, 787 F.3d at 1209 (internal quotations and citations omitted).  "[E]ven 'a series of acts that appear innocent, when viewed separately, may warrant further investigation when viewed together.'" United States v. Gonzalez, 781 F.3d 422, 428 (8th Cir.) (quoting United States v. Weaver, 966 F.2d 391, 394 (8th Cir. 1992)), cert. denied, 136 S. Ct. 139 (2015).  This totality of the circumstances standard precludes courts from engaging in a "divide-and-conquer" analysis of each fact and circumstance separately. Quinn, 812 F.3d at 698 (citing cases).

The undersigned finds that the police did not seize Ingram for Fourth Amendment purposes until the moment Officers Opel and Nash apprehended him following the chase.  Thus, the undersigned will consider the articulable facts available to the police officers at the moment Office Opel physically detained Ingram.  Those articulable facts include the facts personally known and observed by Officer Nash, as well as those known and observed by other officers acting as part of the team that day.[3]   Those facts, when considered together, support a finding of

---

[3] "In deciding whether there is reasonable suspicion, an officer may rely on information provided by other officers as well as any information known to the team of officers conducting the investigation." United States v. Guzman, 926 F.3d 991, 997 (8th Cir. 2019) (citations and internal quotations omitted).  This is sometimes referred to as the "collective knowledge" rule.  In applying the collective knowledge rule, there must be some degree of communication between the officers. See United States v. Shackleford,  830 F.3d 751, 753 (8th Cir. 2016) (citation omitted).  The record in this matter demonstrates that the police officers were acting as a team and communicating relative to the pursuit and seizure of Ingram.  The collective knowledge rule applies.  Thus, it does not matter that Officers Nash and Opel did not see Ingram discard a firearm in the trashcan because Officer Vonnida witnessed that circumstance.

reasonable suspicion.  It does not matter that each fact, viewed in isolation, may reflect innocent conduct or be characteristic of persons engaged in lawful activities.  See Quinn, 812 F.3d at 698; Gonzalez, 781 F.3d at 428.

By the time of the seizure, Officer Nash had observed Ingram twice loitering at the same corner in the Jeff-Vander-Lou neighborhood of St. Louis.  Officer Nash testified that the Jeff-Vander-Lou neighborhood was a high-crime area.  See Roberts, 787 F.3d at 1209.  Ingram was wearing a cross-body satchel, which Officers Nash and Vonnida both recognized as often being used to conceal firearms or narcotics.  See Arvizu, 534 U.S. at 273 (explaining that a reviewing court may consider an officer's training and experience, and that details that may seem innocuous to a layperson may be relevant and suspicious when viewed in a broader context by a police officer).  The undersigned fully credits the Officers' testimony in these respects.

The Court will assume for present purposes that the foregoing facts alone would not provide reasonable suspicion sufficient to conduct a Terry stop of Ingram.  But what happened after Officer Nash attempted to speak with Ingram tilts the scales in favor of finding reasonable suspicion.  First, as Officer Nash was attempting to exit his marked police car to engage Ingram, and before Officer Nash even uttered a word, Ingram fled the area on foot.  Ingram did not simply walk away or ignore Officer Nash; he ran away.  Officer Nash credibly testified that Ingram's flight was suspicious.  Such flight may be considered as part of the reasonable suspicion determination.  See United States v. Sykes, 914 F.3d 615, 618 (8th Cir.) (citing Illinois v. Wardlow, 528 U.S. 119, 124-26 (2000)), cert. denied, 140 S. Ct. 136 (2019).  And Ingram continued to flee as Officer Vonnida gave chase.  Second, Officer Vonnida credibly testified that, as he chased Ingram, he observed Ingram remove a firearm and discard it into an open trashcan, continue running, and scale a fence to avoid the police.  The undersigned finds that, at

the time Officers Opel and Nash actually restrained Ingram's person, that is, at the moment when a Fourth Amendment seizure commenced, Officer Nash's hunch regarding the cross-body satchel became a fact, and the totality of the facts and circumstances provided sufficient reasonable, articulable facts to justify an investigatory detention of Ingram under the Terry rubric.

### 3.    Conclusion – Pursuit and Seizure of Ingram

For the foregoing reasons, the undersigned finds that the police did not commit any Fourth Amendment violations in connection with their initial encounter and subsequent arrest of Ingram.  Therefore, the undersigned recommends that the Court deny Ingram's motion to dismiss the Indictment.[4]

### C.    Seizure of the Taurus Pistol

Because the police committed no Fourth Amendment violation in pursuing Ingram. There is also no basis to suppress the Taurus firearm recovered by Officer Vonnida.  The Fourth Amendment is not implicated by a search or seizure of property that has been abandoned because a defendant who has abandoned his property "'has relinquished h[is] reasonable expectation of

---

[4] Even if some evidence had been obtained in violation of Ingram's constitutional rights, dismissal of the Indictment would not be an available remedy.  See United States v. Blue, 384 U.S. 251, 255 (1966) (explaining that the exclusionary rule, not dismissal, reflects the appropriate remedy when the government obtains evidence in violation of the Constitution).

To the extent Ingram's pending motion is a challenge to the sufficiency of the government's evidence, that challenge is premature.  "The Eighth Circuit has recognized … that 'federal criminal procedure does not provide for a pre-trial determination of sufficiency of the evidence.'"  United States v. Robinson, 903 F.Supp.2d 766, 776 (E.D. Mo. 2012) (quoting United States v. Ferro, 252 F.3d 964, 968 (8th Cir. 2001)).  Therefore, pretrial dismissal of an indictment or count on the basis of the alleged adequacy of the government's evidence is "inappropriate … where, as here, the indictment is sufficient on its face."  Id.; see also United States v. Seawood, 1:17CR42 SNLJ (ACL), 2018 WL 1611672 at *3 (E.D. Mo. Mar. 3, 2015) (explaining that, in criminal cases, a pretrial motion to dismiss is not a proper mechanism to attack the sufficiency of the evidence) (citing United States v. DeLaurentis, 230 F.3d 659, 660 (3d Cir. 2000)).

privacy.'" United States v. James, 534 F.3d 868, 873 (8th Cir. 2008) (alteration in original) (quoting United States v. Tugwell, 125 F.3d 600, 602 (8th Cir. 1997)); see also United States v. Crumble, 878 F.3d 656 (8th Cir.), cert. denied, 139 S. Ct. 187 (2018).  Further, "[u]nder the plain-view exception to the warrant requirement … law enforcement may seize an object without a warrant if '(1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object itself.'" U.S. v. Figueroa-Serrano, 971 F.3d 806, 811 (8th Cir. 2020) (quoting United States v. Vinson, 805 F.3d 1150, 1152 (8th Cir. 2015)), cert. denied, 2021 WL 2637914 (June 28, 2021).

In this case, Ingram abandoned the gun by discarding it in a trashcan as he ran away. Officer Vonnida seized the firearm in plain view from the trashcan.  Accordingly, there is no basis in law or fact to suppress the firearm.

### D.      Ingram's Statements

Following his arrest, and after being provided Miranda warnings, Ingram asked the police about the status of the firearm seized from the trashcan.  Ingram does not contend that the Miranda warnings were inadequate or that his question/statement was not voluntary.[5]  Hence, there is no basis in law or fact to suppress Ingram's statement/question to Officer Nash regarding the gun.

---

[5] Based on the record currently before the Court, it appears that Ingram's question about the gun was spontaneous—it was not made in response to any interrogation, or the functional equivalent of interrogation.  Therefore, that statement would be admissible even if the police had not provided any Miranda warnings.  See United States v. Bailey, 831 F.3d 1035, 1038 (8th Cir. 2016) ("Voluntary statements unprompted by interrogation are admissible with or without Miranda warnings.") (citation omitted); see also Rhode Island v. Innis, 446 U.S. 291, 301-02 (1980).

## RECOMMENDATION

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant Demetrius Ingram's Motion to Dismiss or in the Alternative to Suppress [ECF No. 83] be DENIED.

The parties are advised that they have fourteen (14) days in which to file written objections to the foregoing Report and Recommendation unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).  see also 28 U.S.C. § 636(b)(1)(A), Fed. R. Crim. P. 59(a).

This matter will be set by further order of the Court, before the Honorable Henry E. Autrey, United States District Judge.

/s/ *John M. Bodenhausen*

JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this  29th   day of June, 2021.